1  Matthew J. Matern (SBN 159798)
      mmatern@maternlawgroup.com
2  Scott A. Brooks (SBN 160115)
      sbrooks@maternlawgroup.com
3  MATERN LAW GROUP, PC
   1230 Rosecrans Avenue, Suite 200
4  Manhattan Beach, CA 90266
5
   Class Counsel and Attorneys for Plaintiff
6
7
8                    UNITED STATES DISTRICT COURT
9                   SOUTHERN DISTRICT OF CALIFORNIA
10
11  ARTHUR THOMPSON, and individual,      CASE NO. 20-CV-371-JO(MSB)
12  and on behalf of others similarly situated,
13               Plaintiff,
                                          DECLARATION OF MATTHEW J. MATERN
14  v.                                    IN SUPPORT OF PLAINTIFF'S MOTION
                                          FOR FINAL APPROVAL OF CLASS ACTION
15  NSC TECHNOLOGIES, LLC, a Virginia     SETTLEMENT
    limited liability corporation; BAE
16  SYSTEMS, INC., a Delaware             Date:  March 29, 2023
17  corporation; and DOES 1 through 50,   Time: 9:30 a.m.
    inclusive,                            Courtroom: 4C
18
19               Defendants.
20
21
22
23
24
25
26
27
28

## DECLARATION OF MATTHEW J. MATERN

I, Matthew J. Matern, hereby declare as follows:

1.      I am an attorney duly licensed to practice law in the State of California. I am the principal of Matern Law Group, PC, Class Counsel and counsel of record for plaintiff Arthur Thompson (also "Plaintiff") in this lawsuit, *Thompson v. NSC Technologies, LLC,* case no. 3:20-CV-00371-JO(MSB).

2.      All of the facts stated in this declaration are based on my personal firsthand knowledge, unless another source of information or belief clearly appears from the context, and as to all such matters I believe them to be true.  If called as a witness, I could and would readily and competently testify to all matters stated in this declaration.

3.      This declaration is submitted in support of Plaintiff's Motion for Final Approval of Class Action Settlement and Plaintiff's Motion for Attorney's Fees, Costs and Enhancement Award.

### The Parties

4.      Plaintiff is a former hourly, non-exempt employee of NSC who worked as a welder at the BAE Systems San Diego Ship Repair Inc. shipyard located at 2205 E. Belt Street in San Diego, California from April 2018 through January 2019. He had also worked at the shipyard from December 2016 through July, 2017.

5.       NSC Technologies, LLC ("NSC") is a staffing and recruiting company for industries including shipbuilding and repair. Defendant BAE Systems San Diego Ship Repair Inc. provides ship repair services at a shipyard located north of Naval Base San Diego that it leases from the Port of San Diego. I am informed and believe on such basis state that BAE Systems, Inc. is the parent company of BAE Systems San Diego Ship Repair Inc. (Plaintiff and defendants will be collectively referred to as "the Parties").

6.      According to the data provided by the court-appointed notice and settlement administrator, Phoenix Settlement Administrators, there are 1,746 Class

Members.

## **Procedural Background**

7.     Plaintiff retained Matern Law Group ("MLG" or "Class Counsel") to represent him in his claims against the defendants. Upon being retained, MLG investigated and researched plaintiff's claims and defendants' anticipated defenses. Plaintiff furnished information and documents to MLG which MLG reviewed and analyzed.

8.     On November 1, 2019, my office submitted plaintiff's Private Attorney General Act ("PAGA") notice to the California Labor Workforce Development Agency ("LWDA") and served it on defendants. The PAGA notice (without the enclosure) and LWDA's confirmation receipt were collectively attached as Exhibit 2 (Dkt. 74-1, pp. 65-72) to my declaration submitted in support of preliminary approval. On June 16, 2020 my office submitted a conformed copy of plaintiff's complaint to the LWDA. On October 19, 2021, my office submitted a copy of the Agreement to the LWDA. The LWDA's confirmation receipts were collectively attached to as Exhibit 3 (Dkt. 74-1, pp. 73-74) to my declaration submitted in support of preliminary approval.

9.     On January 10, 2020, plaintiff filed a putative class action against defendants NSC and BAE Systems, Inc. in in the San Diego County Superior Court, alleging violations of California's labor laws: failure to provide required meal periods; failure to provide required rest periods; failure to pay overtime wages; failure to pay minimum wages; failure to pay all wages due to discharged and quitting employees; failure to maintain required records; failure to furnish accurate itemized wage statements; failure to indemnify employees for necessary expenditures incurred in discharge of duties; and unfair and unlawful business practices ("the Action"). (Dkt. 1-2, pp. 24-39.)

10.     On January 14, 2020, plaintiff filed a first amended complaint adding a cause of action for civil penalties under the PAGA. (Dkt. 1-2, pp. 40-56.)

11.     On February 27, 2020, defendants NSC and BAE Systems San Diego Ship Repair Inc. jointly removed the Action to this Court pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§1441 and 1453. (Dkt. 1.)

**Investigation and Discovery**

12.     Upon being retained, MLG interviewed plaintiff at length, obtained important information and documents from plaintiff regarding defendants' wage and hour practices, and conducted research regarding plaintiff's claims and defendants' anticipated defenses.

13.     Defendants informally produced a 15% sampling of time and payroll data and policy documents prior to Early Neutral Evaluation conferences, which was analyzed by an expert statistician. Defendant provided data and materials, including the production of over 70,000 rows of data for over 19,000 shifts, and almost 4,500 pay periods which were analyzed by Plaintiff's counsel with the assistance of an expert statistician, along with multiple written employee handbooks and policies. The expert statistician who reviewed and analyzed defendants' time and payroll records and prepared an analysis which was instrumental in creating a damages model for the mediation. This data and analysis formed much of the basis for the settlement negotiations.

14.     When the Action did not resolve, formal discovery commenced. Plaintiff propounded over 80 document requests and 20 interrogatories on both defendants, to which defendants responded and produced hundreds of pages of documents. Plaintiff also served a request to inspect and enter onto the shipyard property, and three witness deposition notices, including two persons most knowledgeable containing 30 subject categories, although the matter resolved before those items were undertaken. Plaintiff responded to defendants' 25 document requests, produced responsive documents and sat for a full-day deposition.

15.     During this period of investigation and discovery and before entering into the settlement, more than 40 current and former employees were interviewed

about the operations of the shipyard. These employees worked in myriad jobs throughout the shipyard including assembler, cable puller, data analyst, electrician, electrician helper, fire watch, fitter, large machine driver, improver installer, journeyman shipper, labor helper, machinist, paint improver, pipe fitter, rigger, safety technician, security, sheet metal worker, ship fitter, and welder. These employees variously worked as non-exempt employees at times between 2013 and the end of the class period (August 8, 2021) and all of them worked at some point during the class period, making them members of the classes. Importantly, together these 40+ employees could provide a wealth of information regarding shipyard operations both on and off-ship including hours, time keeping, wages, security checks, meal and rest periods, clothing, equipment, etc. from the spectrum of jobs throughout the shipyard over the course of the entire class period.

16.     The discovery, investigation, documents and data produced by defendants permitted the Parties to evaluate their respective positions.

### Settlement

17.     The Parties participated in an Early Neutral Evaluation on April 15, 2020, and a follow-up Settlement Conference on August 26, 2020, both with Magistrate Judge Michael S. Berg.  The Action did not settle.

18.     Months later, after formal discovery had been conducted, the Parties agreed to mediate. On February 23, 2021, the Parties participated in full day mediation with mediator Deborah Saxe.  The Action did not resolve at the mediation, however, Ms. Saxe continued facilitating negotiations between the Parties and on June 9, 2021, nearly four months later, a settlement was reached, subject to preparation of a long-form agreement. A Stipulation of Class Action Settlement and Release ("Agreement") was executed by all Parties on September 2, 2021.  A true and correct copy of the Stipulation of Class Action Settlement and Release ("Agreement") was filed with the Court in conjunction with my declaration

in support of preliminary approval along with the proposed notice (Dkt. 74-1, pp. 24-64).

19.     The mediation and subsequent negotiations were conducted at arm's length, and although the negotiations were conducted in a professional manner, they were adversarial. The Parties went into mediation willing to explore the potential for a settlement of the dispute, but each side was also prepared to litigate its position through trial and appeal if a settlement had not been reached.

20.     On October 21, 2021, plaintiff moved for preliminary approval of the proposed settlement. At that time, plaintiff also moved for leave to file a Second Amended Complaint to add a cause of cation for violation of the Fair Labor Standards Act (FLSA) which had been included in the settlement discussions.

21.     The initial hearing on preliminary approval was vacated and the action was transferred to this Court. The motion for preliminary approval was heard on February 2, 2022 at which time the Court requested further information and clarification regarding the scope of the FLSA claim and investigation and discovery into other potential claims that were subject to release. See, e.g., Dkt. 71, Reporter's Transcript of Proceedings, February 2, 2022. The motion was denied without prejudice.

22.     On October 25, 2022, plaintiff filed a renewed motion for preliminary approval and for leave to file a Third Amended Complaint.

23.     The Settlement for which final approval is now sought is the result of an informed and detailed analysis of Defendants' potential liability of total exposure in relation to the costs and risks associated with continued litigation. Based on MLG's pre-litigation investigation, discovery, and expert analysis, MLG was able to act intelligently and effectively in negotiating the proposed Settlement.

24.     Phoenix Settlement Administrators was appointed by the Court to serve as the Notice and Settlement Administrator at the cost of $15,000.

25.     The settlement of $2,853,572 provides substantial recovery to the Class

Members. At the time of settlement, the Class Settlement Amount was $2,750,000 based upon the then-estimated number of work weeks of 64,738. The Agreement contained an escalator clause whereby if the actual number of workweeks exceeded 71,212 (that is, more than 10% of 64,738), the Class Settlement Amount would be increased by the same number of percentage points above 10% by which the actual number of workweeks exceeds 64,738. Here, the total actual work weeks were 73,650 (equal to 13.766% above 64,738) which resulted in an increase of 3.766% in the Class Settlement Amount to $2,853,572 and a Net Settlement Amount of $1,683,308.09.

26.     The participating Class Members will share pro rata in that Net Settlement Amount of $1,683,308.09which determined as follows:

| | |
|---|---|
| Class Settlement Amount | $2,853,572.00 |
| Est. Class Counsel Fees | ($951,190.70) |
| Est. Class Counsel Costs | ($39,415.78) |
| Class Rep Award: | ($15,000.00) |
| PAGA Payment/LWDA | ($100,000.00) |
| Phoenix Admin. Fees | ($15,000.00) |
| Employer Taxes | ($49,657.52) |
| Net Settlement Fund | $1,683,308.09 |

This results in an estimated average payment to each Class Member of $982.67, exclusive of the taxes on the wages portion. Of the estimated Net Settlement Fund of $1,683,308.09, the wages portion (20%) of that is $336,661.62. The estimated employer's side taxes on that wages portion is $49,657.52.

**Amount in Controversy and Risks Associated with Proceeding with the Action**

27.     At preliminary approval, Plaintiff calculated the potential damages and penalties to be approximately $29,748,650.75. The calculation was based on expert analysis which is derived from the 15% data sampling defendants' payroll and timekeeping records for the period of October 31, 2017 through April 30, 2020 for

132 employees and other data provided during settlement negotiations. Where appropriate, the analysis extrapolated to estimate damages, penalties and interest for all Class Members for the entire Class Period through August 8, 2021 (from January 10, 2016, for the UCL four year statute of limitations, from January 10, 2017 for the three year statute of limitations, and from November 6, 2019 for the PAGA period). The estimated damages and penalties using the actual number of work weeks is $29,748,650.75.

28.    <u>Rest Period Violations:</u> In the analyses developed for settlement discussions described in my declaration submitted in support of preliminary approval (Dkt. 74-1), Plaintiff estimated unpaid premiums for rest break violations at $4,699,979. Using the actual number of work weeks, the estimated unpaid rest break premiums, assuming a 100% violation rate, is $5,346,990.

|   | 73,650 workweeks |
|---|---|
| x | 5 shifts per week |
| x | 100% violation rate |
| x | $14.52 average hourly rate |
|   | $5,346,990 in Unpaid Rest Period Premiums |

29.    <u>Meal Period Violations:</u> Using the actual number of work weeks, the estimated unpaid meal period premiums, assuming a 100% violation rate, is also $5,346,990.

|   | 73,650 workweeks |
|---|---|
| x | 5 average shifts per week |
| x | 100% violation rate |
| x | $14.52 average hourly rate |
|   | $5,346,990 in Unpaid Meal Period Premiums |

30.    <u>Minimum and Overtime Wages Violations and FLSA Claim – Off-The-Clock Work:</u> Updating the valuation of the off-the-clock claim to the actual number of work weeks totals $133,674.75 in unpaid wages. For purposes of valuing the claim, Plaintiff conservatively estimates that employees were not paid an

average of 1.5 minutes per shift in this time spent before and after clocking out. Using the number of workweeks for the entire class period (73,650) and assuming 5 shifts per workweek (a total of 368,250 shifts)[1] results in an estimated 9,206.25 hours of unpaid wages x $14.52 (average hourly rate) = $133,674.75 in unpaid wages. Alternatively, because the employees were scheduled and worked eight hours a day, five days a week, the hours of off-the-clock work was in addition to those regular hours and may be considered overtime hours. When valued as overtime hours at the average hourly overtime rate of $21.78, the total unpaid wages are $200,512.12.

31.     Updating the valuation of off-the-clock work through employees' meal periods due to shutting down and doffing their gear, walking time, waiting to enter the facility, bag checks, and waiting in line to swiping their ID cards and also to clock in and clock out, results in additional unpaid regular wages.

32.     Plaintiff estimates employees worked approximately 15 minutes per shift off the clock. Using the sample data as extrapolated for the 73,650 workweeks, this would result in 92,062.5 hours of unpaid wages.  Extrapolated to the entire class results in an estimated $1,336,747.50 in unpaid regular wages. If calculated as overtime wages, the amount increases to $2,005,121.20.

33.     <u>Rounding:</u> Plaintiff contends that employees' time was rounded to the quarter hour and that the data sample showed rounding with 59.4% of the shifts and 83.3% of the employees analyzed being underpaid. In the sample data, rounding resulted in a net 213 underpaid hours over 19,265 shifts at an average of 1.1 underpaid minutes per shift. For the 368,250 shifts in the class period, this would result in $98,028 in unpaid wages.

34.     <u>Waiting Time Penalties:</u> The amount of estimated waiting time

---

[1] Some employees including Plaintiff, often worked on Saturdays which would increase the total number of shifts, but those shifts are not included in these calculations.

penalties pursuant to Labor Code section 203, assuming 600 former employees, is $2,090,880.

35.    Wage Statement Violations: The amount of estimated penalties under Labor Code section 226(a)assuming 450 employees for the period for the one year prior the filing of the complaint through August 6, 2021, remains at $1,800,000.

36.    Business Expense Reimbursement: The estimated amount of unreimbursed business expenses remains at $373,538

37.    PAGA Penalties: The calculation of minimum PAGA penalties increases to $14,558,600 with the additional 8,921 work weeks, using the default $100 first pay period/$200 pay period penalty amounts.

38.    The total of these damages and penalties, using the regular rate, is $29,748,650.75.

| | |
|---|---|
| Unpaid Rest Period Premiums | $5,346,990.00 |
| Unpaid Meal Period Premiums | $5,346,990.00 |
| Off-The-Clock Work | $133,624.75 |
| Rounding | $98,028.00 |
| Waiting Time Penalties | $2,090,880.00 |
| Wage Statement Penalties | $1,800,000.00 |
| Unreimbursed Expenses | $373,538.00 |
| Base PAGA Penalties | $14,558,600.00 |
| **Total** | $29,748,650.75 |

The estimated interest on the $11,299,170 for the non-penalty damages for unpaid rest period premiums, unpaid meal period premiums, off-the-clock work, rounding, and unreimbursed expenses would be approximately $2,824,792. However, these base damages and penalties do not include the maximum PAGA penalty amounts. With stacking of penalties, the several alleged Labor Code violations would result in substantial PAGA penalties. Under Labor Code section 558(a)(1-2), the failure to pay overtime wages, to provide meal breaks and to provide rest breaks would each result in an initial PAGA penalty of $50, and a subsequent penalty of $100, i.e., $7,279,300 each and $14,558,600 combined. Each additional Labor Code violation

providing the default penalty would be a minimum of another $14,558,600 in penalties. However, even greater penalties are available. For instance, the PAGA penalties under Labor Code 226.3 for wage statement violations of section 226(a), are $250 per employee per initial violation and $1,000 per employee for each subsequent violation, which in this case would total another $72,364,500 in PAGA penalties. Therefore, the maximum damages and penalties available would be in excess of $90,000,000.

39.     While Plaintiff and MLG remain confident in the merits of Plaintiff's claims, a legitimate controversy exists as to most of the causes of action.  Plaintiff contends that the Class Members' claims can be proven using common class-wide methods of proof, including the defendants' uniform company-wide policies and practices and Class Members' timekeeping and payroll records. However, Plaintiff and MLG considered several factors in reaching the decision to settle at this point in the Action. One such factor is that although plaintiff strongly believes in the merits of his claims, a legitimate controversy exists as to crucial aspects of the claims and damages. For example, plaintiff contends that defendants failed to compensate employees for all time spent performing work before and after their shifts and during rest and meal breaks, and were not reimbursed for necessary business expenses. Defendants would argue that employees recorded their own time worked including meal periods, and the touchscreen timekeeping system included the requirement that the employees affirmatively verify that the times recorded were correct and also advised employees that if they were not provided a compliant meal or rest periods that they were to advise defendants. Thus, Defendants will argue, every shift the employees affirmed that they were properly paid for all hours worked, received all regular and overtime wages to which they were entitled, were provided compliant meal and rest breaks in accordance with California law, received accurate wage statements, were timely paid all wages owed to them upon separation and otherwise and were properly reimbursed for necessary business-related

expenses. Defendants would also argue that time spent in off-the-clock work such as donning and doffing, walking time, security checks, waiting in line, etc., all depended on each employee's particular circumstances and experience and not common evidence. Defendants would be expected to argue that in light of these records, certification would be precluded by individual issues. Additionally, Plaintiff recognizes that proving the amount of wages due to each Class Member would be an expensive, time-consuming, and uncertain proposition. Given the volume of data Defendants did not have in their possession, requiring Plaintiff, through his expert, to have to extrapolate violations and damages, proving damages (and PAGA penalties) to a jury and the Court was also a risky endeavor and could potentially cause confusion to a jury. In contrast, if the Court approves the Settlement, Class Members will receive timely relief and avoid the risk of an unfavorable judgment.

40.    Plaintiff further contends that defendants required employees to input the exact same meal start and end times at the end of each day, when in fact the times varied. In response, defendants would contend that employees could and should have brought any evidence of non-compliance to defendants' attention and clocking in and clocking out was voluntary and not defendants' fault. Defendants would also assert that the Action is not suitable for class or representative treatment, and a trial would be unmanageable. With respect to the PAGA claims, Plaintiff faces a number of risks.  Plaintiff's claims for wage statement violations from entities other than the PRSA and penalties under PAGA are derivative of the other claims.  If relief were denied on the other claims, Plaintiff would recover no damages on these claims. It is unlikely that Plaintiff would be able to recover wage statement penalties for unpaid minimum and overtime wages. See *Maldonado v. Epsilon Plastics, Inc*., 22 Cal. App. 5th 1308, 1334 (2018) (holding that plaintiffs were not entitled to penalties for inaccurate wage statements where the wage statements accurately reflected the pay plaintiffs actually received). Even if derivate wage statement penalties are available, the finder of fact would have to determine that Defendant's conduct was willful and

knowing and intentional. This is very difficult to prove even if the class were to prevail on the merits on the underlying claims. See, e.g., *Amaral v. Cintas Corp. No.2*, 163 Cal. App. 4th 1157, 1203-4 (2008) (holding that the employer did not willfully fail to pay wages under Cal. Lab. Code § 203 even though the class prevailed on the merits on the underlying claim for failing to pay living wages); *Willner v. Manpower Inc*., 35 F. Supp. 3d 1116, 1131 (N.D. Cal. 2014). As to Plaintiff's PAGA claim, the Court has discretion to reduce the amount of penalties, even if Plaintiff is successful on this claim.

41.    Plaintiff also recognizes the substantial risks involved in litigating the Action, including the fact that this Court may deny class certification; establishing manageability; the expensive, time-consuming, and extremely uncertain proposition of proving the amount of wages due to each Class Member; the prospect that the Court would, in its discretion, reduce any penalties won under PAGA; the likelihood that any verdict will inevitably lead to one or more appeals; further litigation will cause inconvenience, distraction, disruption, delay, expenditures and recovery disproportionate to the potential benefits of continued litigation; and this area of the law is constantly evolving creating uncertainty for employees.  Defendants vigorously litigated the case and expressed every intention of continuing their defense through class certification, trial, and appeal. In contrast, because of the proposed settlement, Class Members will receive timely and certain relief and avoid the risk of an unfavorable judgment and a questionable appellate outcome.

42.    The Settlement reflects recovery by Plaintiff equal to approximately 18.79% of the maximum potential estimated value of all of his underlying California Labor Code claims, not including the base PAGA penalties (which if included would be equal to approximately 9.6% of the maximum potential damages and PAGA penalties). This maximum potential exposure analysis, although conservative, was based on numerous premises favoring the Class. Thus, a more realistic assessment of class-wide damages, even assuming class certification and a

13

finding of liability, would have been a fraction of the "soaking wet" evaluation.

43.     In sum, when the risks of litigation, the uncertainties involved in achieving class certification, the burdens of proof necessary to establish liability, and the probability of appeal, whether plaintiff wins or loses, are balanced against the merits of Plaintiff's claims, it is clear that the Settlement Amount is fair, adequate and reasonable, including the anticipated $1,683,308.09 net recovery to the Settlement Class. The significant risk that this Court may deny class certification is obviated by the Settlement.  Class Members will receive timely relief and avoid the risk of an unfavorable judgment. Thus, the overall benefits of the proposed Settlement outweigh the potential risks, expense and likely duration of further litigation.  For these reasons, plaintiff and MLG support the proposed Settlement as being in the best interests of the Class.

## Qualifications of Class Counsel

44.     MLG is a 26-attorney law firm that is one of the largest employment law firms in California, almost exclusively representing employees in individual, representative and class actions in state and federal courts throughout California.  Of all the attorneys at MLG, I am the attorney with the most active trial and pretrial calendar. I have personally tried approximately 25 cases, including approximately 20 jury trials. I have personally represented clients in numerous wage and hour class, representative and collective actions that settled with per-class-members recoveries in a similar range to the Settlement in this case.

45.     I received a B.A. with honors in 1986 from Tulane University. I received my J.D.  from Southwestern University School of Law in 1991. I became an active member of the State Bar of California in September 1992, and have been an active member in good standing continuously since then. I have been practicing as a litigation attorney in Los Angeles since 1992, and have been concentrating on employment litigation since approximately 1997. Among other professional affiliations, I am a lifetime member of the Consumer Attorneys Association of Los

Angeles and an active member of the California Employment Lawyers Association.

46.     In 1992, I founded the general partnership, which is the predecessor of Rastegar & Matern, Attorneys at Law, A Professional Corporation.  In 2012, I founded the Law Offices of Matthew J. Matern, which changed its name to Matern Law Group in January 2014, and then to Matern Law Group, PC on or about May 25, 2016.

4.     Since 1992, I have been heavily, continuously, and successfully involved in active litigation and trial work, including extensive work in employment litigation and wage and hour class, representative and collective actions. Over the course of my career, I have been involved in approximately 100 class action settlements, with many of them settling in the seven figure range, including settlements in the amount of $140 million, $26 million, $18 million, $9.75 million, $8.5 million, $7.0 million, $6.0 million, $6.0 million and $5.0 million. I have represented clients in numerous wage and hour class action lawsuits that settled with per-class member recoveries in a range similar to the anticipated per-class member recovery in this case. I have also been appointed class counsel (lead or co-lead counsel) in at least twenty-nine certified wage and hour class action cases, including this case, which involved contested certification proceedings: *Dekker v. Vivint Solar, Inc*. Case No. 3:19-cv-07918-WHA (Northern District of California); *Zarate v. La Pizza Loca, Inc*., Case No. BC642714 (Los Angeles Superior Court); *Morgan v. Rohr, Inc.* Case No. 20-cv-574-GPC-AHG (Southern District of California); *Romero v. California Rehabilitation Institute, LLC*, Case No. CV 19-06369 TJH (AGR) (Central District of California); *Reyes v. Boston Market Corp*., Case No. 19STCV09405 (Los Angeles Superior Court); *Villalta v. Leonardo's Restaurant, Inc*. Case No. BC542133 (L.A.S.C.); *Melara v. Securitas Security Services USA, Inc.* Case No. BC448078 (Los Angeles Superior Court); *Wilson v. RockTenn, Case No*. BC488456; *Gutierrez v. California Commerce Club, Inc.*, Case No. BC360704; *Gutierrez v. Dynaflex Products*, Case No. BC368749; *Garmendia v. Fortune*

1   *Fashions Industries*, LLC, Case No. BC389960; *Mendoza v. National Gypsum*
2   *Services Company*, Case No. BC366877; *Hall v. K S World, Inc*., Case No.
3   BC615646; *Barajas v. WHM, LLC, et al*, Case No. BC491045; *Chhan v. Southern*
4   *California Gas Company,* Case No.  BC522049; *Ibarra v. Artisan Screen Printing,*
5   Case No. BC644708; *Sanchez v. McDonald's, Case* No. BC499888; (Orange
6   County Superior Court) *Ortiz v. Coronado Stone*, Case No. CIVSS806131; *Soto v.*
7   *Envision, et. al.,* Case No. CIVDS1414104; (Alameda County Superior Court) *Del*
8   *Taco Wage and Hour Cases,* Case No. JCCP4904; (Santa Clara Superior Court);
9   *Shuff v. Stevens Creek Quarry,* Case No. 18CV322077; (San Francisco County
10  Superior Court) *ABM Industries Overtime Cases,* CJC-07-004502; and cases in
11  California federal courts, such as *Hines v. KFC U.S. Properties, Inc*., U.S. District
12  Court for the Southern District of California, Case No. 3:09-cv-02422, *Negrete v.*
13  *ConAgra Foods, Inc., et al*., U.S. District Court for the Central District of
14  California, Case No. 2:16-cv-631-FMO-AJW, *Lopez v. Delta Air Lines, Inc*., U.S.
15  District Court for the Central District of California, Case No. BC586813, *Bowen v.*
16  *Target Corporation*, U.S. District Court for the Central District of California, Case
17  No. 216-cv-02587-RGK-FFM;  *Richardson v. Interstate,* U.S. District Court for the
18  Eastern District of California, Case No. 1:20-cv-00171-NONE-JLT; *Goldstein v.*
19  *ExxonMobil*, U.S. District Court for the Central District of California, Case No.
20  2:17-cv-02477-DSF,  *Shiferaw v. Sunrise,* U.S. District Court for the Central District
21  of California, Case No. 2:13-cv-02171-JAK-PLA.

22       47.     I have been counsel in a number of cases which resulted in published
23  appellate victories including two of the leading "me-too" witness cases in
24  California, *Pantoja v. Anton* (2011) 198 Cal.App.4th 87 and *Meeks v. Autozone, Inc.*
25  (2018) 24 Cal.App.5th 855.  Most recently, we obtained the reversal of an adverse
26  judgment in a PAGA bench trial, *Zuniga v. Alexandria Care Center, LLC* (2021) 67
27  Cal.App.5th 871.  Other published appellate victories include *ABM Industries*
28  *Overtime Cases* (2017) 19 Cal.App.5th 277; *Julian v. Glenair* (2017) 17

16

Cal.App.5th 853; *Ventura v. ABM Industries, Inc.* (2012) 212 Cal.App.4th 258; *Franco v. Arakelian Enterprises, Inc.* (2012) 211 Cal.App.4th 314; *Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221; *Gutierrez v. California Commerce Club* (2010) 187 Cal.App.4th 969; *Franco v. Athens Disposal Company, Inc.* (2009) 171 Cal.App.4th 1277. Unpublished appellate successes include *Christman v. Apple Am. Grp. II, LLC,* No. B271937, 2017 WL 4402124 (Cal. Ct. App. Oct. 4, 2017); *Pauley v. CF Entm't,* No. 14-55131, 2016 WL 1169425 (9th Cir. Mar. 25, 2016) (two related appeals); *Pauley v. CF Entm't,* No. 17-56057, 2019 WL 2089930 (9th Cir. May 13, 2019) (three related appeals)*; Navarro v. 4 Earth Farms, Inc.,* No. B28485, 2019 WL 493781 (Cal. Ct. App. Feb. 8, 2019); *Soto v. Superior Court of San Bernardino Cty.,* No. E071920, 2019 WL 4254631 (Cal. Ct. App. Sept. 9, 2019) (writ issued), and *Rojas v. Glenair, Inc.,* No. B302402, 2020 WL 4435156, (Cal. Ct. App. Aug. 3, 2020) review den. (Nov. 10, 2020). The California Supreme Court granted our requests for depublication of four opinions which were detrimental for workers, *Cacho v. Eurostar, Inc.,* No. S260295, *Starks v. Vortex Industries, Inc.,* No S264854, *Salazar v. See's Candy Shops, Inc.* S269268 and *Meza v. Pacific Bell Telephone Company*, No. S275581. My work has led me to be recognized as a Southern California Super Lawyer every year since 2009.

48.     The following experienced and well-regarded MLG attorneys also worked on this case:

A.     Senior Associate Debra J. Tauger heads MLG's law and motion department and is often called upon to prepare motions requiring rigorous analysis on short notice, which enables MLG to aggressively litigate and defend against well-resourced defense counsel. Ms. Tauger is also an esteemed member of MLG's appellate law group. Ms. Tauger wrote the winning briefs in the following state and federal appeals: *Pauley v. CF Entm't,* No. 14-55131, 2016 WL 1169425 (9th Cir. Mar. 25, 2016) (two related appeals); *Pauley v. CF Entm't,* No. 17-56057, 2019 WL 2089930 (9th Cir. May 13, 2019) (three related appeals)*; Julian v. Glenair,*

*Inc.* (2017) 17 Cal.App.5th 853; *Christman v. Apple Am. Grp. II, LLC,* (Cal. Ct. App. Oct. 4, 2017, No. B271937), 2017 WL 4402124; *Navarro v. 4Earth Farms, Inc.* (Cal. Ct. App. Feb. 8, 2019, No. B284853), 2019 WL 493781; *Rojas v. Glenair, Inc.* (Cal. Ct. App. Aug. 3, 2020, No. B302402), 2020 WL 4435156 and *Collins v. HASA, Inc.* (Cal. Ct. App. Mar. 26, 2021, No. A158657), 2021 WL 1152941. She also succeeded in obtaining issuance of a writ in *Soto v. Superior Court of San Bernardino Cty.* (Cal. Ct. App. Sept. 9, 2019, No. E071920), 2019 WL 4254631 and the denial of a petition for review in *Rojas* (rev. denied Nov. 10, 2020). She also worked on the briefing (Reply Brief) which resulted in the reversal of a judgment of a bench trial and a published appellate decision, *Zuniga v. Alexandria Care Center, LLC* (2021) 67 Cal.App.5th 871.

      B.     Senior Associate Scott A. Brooks graduated from the University of California, Berkeley in 1987 with a degree in Political Science followed by a law degree from Loyola Law School in 1992. Mr. Brooks has extensive experience in labor and employment class and representative actions, complex litigation, and mass torts. He was one of the Class Counsel in the class action lawsuit which resulted in the published opinion, *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319 and a $47.5 million dollar settlement reached during trial. Mr. Brooks also served as one of the national coordinating counsel for the nation's largest retailer in toxic tort litigation, including the defense of Proposition 65 and related claims. Mr. Brooks has extensive experience arguing before the California appellate courts and has handled dozens of appeals and original proceedings, in most of which he served as the primary appellate counsel in briefing and argument. Reported decisions in which Mr. Brooks served as plaintiff's or Class Counsel on appeal include *Zuniga v. Alexandria Care Center, LLC* (2021) 67 Cal.App.5th 871, *Heyen v. Safeway Inc.* (2013) 216 Cal.App.4th 795, *Puerto v. Superior Court* (2008) 158 Cal.App.4th 1242, *Harper v. 24 Hour Fitness, Inc.* (2008) 167 Cal.App.4th 966, *Ralphs Grocery Co. v. Superior Court* (2004) 112 Cal.App.4th 1090, and *Prachasaisoradej v.*

*Ralphs Grocery Co., Inc.* (2007) 42 Cal.4th 217. Mr. Brooks has been recognized as a Super Lawyer from 2019 – 2023.

        C.     Senior Associate and Chief Operating Officer of MLG, Dalia Khalili, has been practicing at both MLG and, formerly, at Rastegar & Matern, since May of 2008. Ms. Khalili is a 2007 graduate of UC Hastings College of the Law and received her undergraduate degree from UCLA. She has been an active member of the California State Bar in good standing since December 2007. Ms. Khalili has over fourteen years of experience handling wage-and-hour class actions and plaintiff's side employment litigation cases and has been appointed Class Counsel in numerous cases in state and federal courts in California. Ms. Khalili has prevailed in both bench and jury trials on employment matters that she personally first-chaired and has certified numerous class action cases on wage and hour issues. Ms. Khalili was been recognized as a Southern California Super Lawyer's Rising Star every year from 2015 through 2021 and was included on the Southern California Rising Stars' Up-and-Coming 50 Women List for 2020 and 2021, as well as the Southern California Rising Stars' Up-and Coming 100 List for 2021. Ms. Khalili was recognized as a Southern California Super Lawyer for 2022.

        D.     Associate Kayvon Sabourian's practice focuses on representing employees in class action, retaliation, and sexual assault cases. Mr. Sabourian received his Bachelor of Science degree from the Cornell University School of Industrial and Labor Relations in 2006 and his J.D. from the University of Texas School of Law in 2010. He has been licensed to practice law in Texas since 2011 and in California since 2016. Prior to joining MLG, Mr. Sabourian was an attorney for the Equal Justice Center, a Texas-based non-profit law firm, where he recovered millions of dollars in damages for immigrant workers. He has presented lectures on laws affecting low-income workers as a panelist at Continuing Legal Education seminars, including at the State Bar of Texas Annual Meeting.

**Attorney's Fees and Costs**

49.     The Settlement provides for attorney's fees to Class Counsel of one-third (1/3) of the Class Settlement Amount, i.e., $951,190.66 plus litigation costs. Based on my experience, I believe the fee provision is reasonable. This percentage of the common fund is in line with other attorney fees awards in the Ninth Circuit. *See, also Lafitte v. Robert Half Int'l Inc.,* 1 Cal. 5th 480, 506 (2016). Additionally, the fee percentage requested is less than that which MLG charges in other employment cases. MLG undertook the Action with payment deferred to the end of the case, and then, of course, contingent on the outcome. Our efforts have resulted in substantial benefits to the Participating Settlement Class Members in the form of a significant settlement fund established to compensate them for defendants' allegedly unlawful conduct.

50.     MLG invested significant time and resources into the Action (not including all the work we did pre-litigation), with payment deferred to the end of the case, and then, of course, contingent on the outcome. MLG's efforts have resulted in substantial benefits to Class Members in the form of a significant settlement fund established to compensate Class Members for Defendants' unlawful wage and hour practices.  Without MLG's efforts, the claims as alleged in the complaint would almost certainly have gone without remedy.

51.     The efforts expended by MLG thus far include, but are not limited to, the following: conducting extensive investigation of and legal research regarding Plaintiff's claims and Defendants' defenses including serving and responding to written discovery; reviewing documents provided by Plaintiff; preparing the complaint and three amended complaints; reviewing time and payroll records and other employment records produced by Defendants; defending Plaintiff's deposition; analyzing class member time and pay data and prepare a damages analysis for the mediation and settlement conferences; preparing three mediation briefs; preparing for and attending a total of 4 mediations and ENEs/settlement

conferences; meeting and conferring numerous times with Defendants' counsel regarding possible settlement; attending other court hearings; negotiating, drafting and revising the Memorandum of Understanding, long-form Settlement Agreement, Notice, Claim Form, and proposed order, and drafting the Motion for Preliminary Approval; drafting supplemental briefing to support Preliminary Approval, and drafting the Motion for Final Approval. MLG also extensively met with Plaintiff's expert to put together damages models based on the information provided by Defendants, and otherwise preparing for certification with an eye to trial.

52.     The foregoing efforts were necessary to achieve a settlement that substantially benefits the class.  Plaintiff's counsel felt particularly strong about litigating this case to trial (if needed) to obtain a substantial recovery due the ongoing violations of the class members' rights under the Labor Code. In light of the circumstances of this case, Plaintiff's counsel and Plaintiff felt strongly about dedicating the time and effort to ensure justice and a substantial recovery to the class and were ready and willing to take this case to trial.  However, the settlement agreement entered into ensured that the class would be well compensated that the benefit to taking the settlement significantly outweighed the risk of trial and potential appeal.

53.     Plaintiff's litigation costs as of this date are $39,415.78. I believe that these costs are reasonable as they include $1,632.28 for filing fees and other costs from the initial state court action, and following removal to this Court, $37,783.50 including costs for the mediation ($8,450.00), expert services ($17,041.40), investigation ($7,862.50), court reporters ($3,973.64), delivery of documents ($349.95) and research services ($106.01).

**Class Representative Enhancement Payment**

54.     The Agreement provides for a Class Representative enhancement payment to plaintiff Arthur Thompson of $15,000.00 which I believe is fair and reasonable. This payment is intended to recognize Mr. Thompson's work, efforts

and risks in assisting with the prosecution of the Action on behalf of the Class and in giving defendants a broader release than other Settlement Class Members. During this litigation, Mr. Thompson cooperated with MLG and took actions to protect the interests of the Class. He provided valuable information regarding defendants' wage and hour practices and policies, assisted with discovery, kept informed of the developments in the Action, made himself available to my staff, informed my office of relevant information and participated in decisions concerning the Action. The information and documentation provided by Mr. Thompson were instrumental in establishing the wage and hour violations alleged in the Action, and the recovery provided for in the Settlement would not have been possible to obtain without his participation.

55.     Mr. Thompson faced many risks in bringing the case as a class action. He assumed the expense and risk in prosecuting the Action and considered the best interests of the Class rather than his own personal interests in agreeing to mediate and settle the case. Mr. Thompson took the risk that prospective future employers may not hire him because he brought this Action against a past employer. Without the effort and risks taken by Mr. Thompson, the Class Members likely would not have received any financial benefit. Because of Mr. Thompson's efforts, 1,745 Class Members will receive payment for wage and hour violations they may have never known about on their own or been willing to pursue on their own.

56.     If each Class Member attempted to pursue his or her legal remedies individually, each person would have been required to expend a significant amount of their own monetary resources and time. Because the claims are relatively modest, and the filing fees and other litigation costs would inevitably exceed any potential recovery, it would be economically infeasible for most Class Members to litigate their claims separately. Trying potentially thousands of cases individually would require substantial repetition of evidence and could result in conflicting judgments while imposing an extraordinary burden on the Parties' and the Court's resources.

1   Moreover, Class Members' claims can be proven using common class-wide
2   methods of proof, including defendants' uniform company-wide policies and
3   practices and Class Members' timekeeping and payroll records.

4        57.     In sum, the Action would not have been possible without Mr.
5   Thompson's involvement, who put his own time and effort into the litigation,
6   sacrificed the value of his own individual claims, placed himself at risk for the sake
7   of the other Class Members and gave up more rights than the other Class Members.
8   The requested Enhancement Payment is therefore reasonable to compensate Mr.
9   Thompson for his active participation in the Action.

10        I declare under penalty of perjury under the laws of the United States of
11   America that the foregoing is true and correct.

12        Executed on March 26, 2023 at Manhattan Beach, California.

13

14                                        Matthew J. Matern